[Cite as *Slater v. Altman Co.*, 2013-Ohio-4405.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN   COUNTY

MARSHALL SLATER, dba                     :
SLATER WELDING & ERECTORS          :
                                                              :      Appellate Case No. 2013-CA-4
          Plaintiff-Appellee                       :
                                                              :      Trial Court Case No. 2007-CV-215
v.                                                          :
                                                              :
THE ALTMAN COMPANY, et al.          :
                                                              :      (Civil Appeal from
          Defendant-Appellant                  :       Common Pleas Court)
                                                              :

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of September, 2013.

. . . . . . . . . . .

AARON FALVO, Atty. Reg. #0076301, Blumenstiel, Evans & Falvo, LLC, 261 West Johnstown
Road, Columbus, Ohio 43230
          Attorney for Plaintiff-Appellee

STEVEN D. ROWE, Atty. Reg. #0020475, and ERICA A. PROBST, Atty. Reg. #0073486,
Kemp, Schaeffer & Rowe Co., LPA, 88 West Mound Street, Columbus, Ohio 43230
          Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.,

     **{¶ 1}**     The Altman Company appeals from the trial court's entry of judgment in favor of

appellee Marshall Slater for $132,690 following a bench trial in this breach-of-contract action.

{¶ 2} In two related assignments of error, the Altman Company ("Altman") challenges the legal sufficiency and manifest weight of the evidence to support the trial court's judgment.

{¶ 3} The record reflects that Altman served as one of five prime contractors on a project to build a school for the Mechanicsburg School District. Altman worked under a construction manager, Smoot Construction Company, which managed the entire project for the school district. Altman's contract provided for it to be the general-trades contractor. To perform its responsibilities, Altman hired a number of subcontractors. One of them was Marshall Slater, the sole proprietor of Slater Welding & Erectors. After some negotiation, Slater and Altman entered into a subcontract requiring Slater to perform steel erection on the project for $274,000.

{¶ 4} Slater and his crew began their work around February 2006. That spring, a dispute arose regarding Slater's installation of a "shelf angle" or "relief angle."[1] Altman claimed installation of the angle was part of Slater's contract. Slater disagreed, asserting that the contract he negotiated with Altman did not require him to install the angle. Ultimately, he refused to perform the work. Altman responded by advising Slater that it would hire someone else to install the angle and deduct the cost from his compensation.

{¶ 5} Around the same time, a second problem arose. Slater fell behind schedule in erecting the steel. He attributed his delay to two things: late steel deliveries from the steel supplier, Cape Coral Steel, and Cape Coral's frequent delivery of steel out of sequence, which required Slater to move his equipment and crew to different parts of the building—a process that could take half a day. For its part, Altman did not dispute that late steel deliveries occurred or that Cape Coral supplied steel out of sequence. It presented testimony, however, that Slater's

---

[1] In construction, a "shelf angle" or "relief angle" is an L-shaped support attached laterally at various levels to the exterior of the structural framing to support the exterior veneer, typically brick or stone, so that the veneer is non-loadbearing.

delay in erecting the steel was attributable largely to having an undersized and inexperienced crew.

{¶ 6}  Regardless of the cause of Slater's delay in erecting the steel, a meeting occurred in May 2006 to discuss the problem. During the meeting, the parties discussed hiring an additional crew to assist Slater. Altman presented testimony that Slater agreed to the proposal and agreed that payment for the additional crew would be deducted from his compensation. Slater denied reaching such an agreement. He admitted that Altman proposed hiring another crew to assist him. He claimed, however, that he requested additional information from Altman about the cost and that he never received an answer. In any event, Altman promptly hired another company, Watertown Steel, to assist in the steel erection.

{¶ 7}  Slater later submitted a periodic pay application to Altman requesting more than $70,000 for work performed. Altman responded with a letter advising him that he would receive approximately $10,000 after deductions for payment to Watertown Steel and for the cost of having the relief angle installed. As a result of the on-going dispute, Slater and his crew failed to appear at the job site on June 26, 2006. After negotiations with Slater failed, Altman gave him written notice that it would hire additional workers to complete his work and that the cost would be deducted from his compensation under the subcontract. Altman proceeded as it indicated and completed the steel erection at a claimed cost of $371,766.45.

{¶ 8}  In September 2006, Slater filed a lien against the public funds held by Mechanicsburg in the amount of $132,690. Slater filed the present action in July 2007, alleging breach of contract and seeking foreclosure on the lien. Altman filed a counterclaim, seeking

damages for the extra costs it incurred to complete the steel erection. Altman also filed a third-party complaint against Cape Coral, seeking damages for the late and out-of-sequence delivery of steel. Cape Coral subsequently filed for bankruptcy and was dismissed as a party.

{¶ 9}     A lengthy bench trial in the above-captioned matter was completed in October 2009. More than three years later, the trial court filed a written decision and entered judgment in favor of Slater. In support, the trial court reasoned:

> The Court finds that Defendant The Altman Company (Defendant) materially breached the parties' contract through its failure to pay Plaintiff pursuant to the terms of the contract, and that Plaintiff was damaged in the amount of $132,690.00 plus interest.
>
> The Court finds that Defendant did not receive Plaintiff's consent in the manner prescribed by their contract to reduce Plaintiff's payment rights in order to pay for the additional steel installer, Watertown Steel, and that Defendant made improper deductions from or reductions to Plaintiff's payments.
>
> The Court finds that the delays in metal installation were due to the problems with timely and orderly delivery of materials from the steel supplier.
>
> The Court finds that these supplier problems were not Plaintiff's fault.
>
> The Court finds that Plaintiff performed Plaintiff's contractual obligations under the contract at least until Defendant's material breach in payment.
>
> The Court finds that the parties' contract did not require Plaintiff to install the brick relief angles.

The [C]ourt finds Plaintiff's witnesses to be more credible than those of Defendant.

Judgment in favor of Plaintiff is hereby granted for $132,690.00.

It is therefore ordered that the amount of $132,690.00 plus interest be released from the public fund to Plaintiff.

Defendant The Altman Company's claims against Plaintiff are dismissed.

(Doc. #120 at 1-2).

{¶ 10} In its two assignments of error, which are briefed together, Altman challenges the trial court's finding that Slater was not obligated to install relief angles. Altman also disputes the trial court's finding that it breached the parties' contract by failing to pay Slater. Altman insists that Slater breached the contract by falling behind on the project, agreeing to pay for an additional steel-erection crew, and then abandoning the job. Altman raises its arguments in the context of a sufficiency-of-the-evidence and manifest-weight-of-the-evidence challenge to the trial court's judgment.

{¶ 11} "Sufficiency" is the standard used to determine whether the evidence is adequate to submit a case to the trier of fact. The test for legal sufficiency is "whether any evidence exists on every element of each claim or defense for which the party has the burden to go forward." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, 526, ¶25. A manifest-weight-of-the evidence challenge is "qualitatively and quantitatively different[.]" *Id.* at ¶17. When evaluating a manifest-weight challenge, this court must weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving evidentiary conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage

of justice that the judgment must be reversed. *Id.* at ¶20. "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.'" *Id.* at ¶21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3. "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.*

{¶ 12}  With the foregoing standards in mind, we conclude that the trial court erred in finding Slater not obligated to install relief angles under the parties' contract. At trial, Slater testified that he never agreed to install relief angles, which he described as angle-shaped pieces of iron used for structural support. (Tr. Vol. I at 42). He specifically excluded installation of relief angles in his bid to Altman for the subcontractor's job. *Id.* According to Slater, the parties agreed he would not be required to install relief angles when they negotiated the $274,000 subcontract price. (*Id*. at 41). In light of this testimony, we cannot say the record contains legally insufficient evidence to support the trial court's judgment with regard to the relief-angle issue.

{¶ 13}  However, the trial court's finding that Slater was not required to install relief angles is against the weight of the evidence. Slater's bid proposal was an offer. It was not a contract. The signed agreement between Slater and Altman deviated from Slater's earlier bid in multiple ways. Most notably, the subcontract defined the scope of Slater's work and, among other things, required him to install or erect all "Miscellaneous Metals" and to perform the work required by "Specification Section 05500." (Plaintiff's Exhibit 2 at 1). Slater admitted that he signed the subcontract despite "really not knowing what was in the specifications." (Tr. Vol. I at

93). We note, however, that the record contains Specification Section 05500, which is captioned "Miscellaneous Metals." It provides that the work includes "Shelf angles." At trial, Slater himself presented uncontroverted testimony from Cape Coral president Robert Schultz that "relief angles" and "shelf angles" are the same thing. (Tr. Vol. II at 227).

{¶ 14} It is well settled that a trial court must enforce a contract as written where the language used is clear and unambiguous. *Fifth Third Bank W. Ohio v. Carroll Bldg. Co.*, 180 Ohio App.3d 490, 2009-Ohio-57, 905 N.E.2d 1284, ¶13-14 (2d Dist.). Here the parties' subcontract clearly and unambiguously required Slater to install the disputed relief angle, which was a Miscellaneous Metal identified in Specification Section 05500. Slater breached the subcontract insofar as he refused to install the relief angle.[2] Therefore, Altman was entitled to have the work performed and to deduct the cost from Slater's compensation—as it warned him in writing that it would do. The trial court's finding to the contrary is against the manifest weight of the evidence.[3]

{¶ 15} The remaining question is whether Slater breached the parties' contract by falling behind on the project, agreeing to pay for an additional steel-erection crew, and then quitting the job when Altman deducted the extra cost from his compensation. As set forth above, the trial court found that Slater was not responsible for the steel-erection delays, that he did not agree to pay for an additional crew, and that Altman breached the contract by failing to compensate him pursuant to the terms of the subcontract.

---

[2] Parenthetically, we note that Slater did not quit the job due to the relief-angle dispute. (Tr. Vol. I at 109). He permanently left the job site only after Altman later deducted from his compensation the cost of hiring a second steel-erection crew. (Tr. Vol. II at 200).

[3] Because the present case involved a bench trial, our finding in favor of Altman on a weight-of-the-evidence issue does not require a retrial. Instead, this court may weigh the evidence and render the judgment the trial court should have rendered. *See* App.R. 12(C).

**{¶ 16}** Having reviewed the record, we find there is evidence to support the trial court's resolution of the foregoing issues. Altman seeks to attribute the steel-erection delays to the size and inexperience of Slater's crew. However, evidence was elicited from Slater about whether his problems were attributable to late and out-of-sequence steel deliveries. Slater agreed that the steel was delivered late and that he was "ready for steel on this job at various times throughout the project and it wasn't there[.]" (Tr. Vol. I at 103). He also agreed with the suggestion that the steel was delivered out of sequence, which impaired his ability to "perform [his] job as it was being required by the Smoot Company[.]" (*Id*. at 104). The record contains additional instances of such testimony by Slater. (*Id*. at 101, 106, 127, 129).

**{¶ 17}** Slater's wife, Jane Slater, also agreed that "there were problems in the field in terms of [her] husband waiting on steel to be delivered to the site[.]" (Tr. Vol. II at 203). Mrs. Slater, who worked as a secretary for Slater Welding & Erectors, additionally agreed that Slater reported instances of steel being "delivered [that] was not in the right sequence for him to do what he was supposed to be doing[.]" (*Id*. at 203). There was also testimony from her about her husband needing to refabricate some of the steel that he received from Cape Coral. (*Id*. at 204).

**{¶ 18}** The record contains other evidence attributing the project delays to steel-related problems for which Slater was not responsible. Altman president Jon Altman testified about a letter he received from Smoot attributing the project delays to "the late delivery of steel, joists, and deck[.]" (*Id*. at 250). Later in his testimony, Jon Altman admitted hearing from Slater that the late steel deliveries were "holding him up from doing his work." (*Id*. at 254). Jon Altman even acknowledged that Cape Coral's late delivery of "steel shop drawings" ultimately "caused the steel erectors to have to walk off the job." (*Id*. at 287). Jon Altman admitted that Slater was not

responsible for the shop drawings or the steel-delivery problems. (Tr. Vol. III at 328).

{¶ 19} Altman secretary-treasurer Norm Altman admitted that Slater had complained "several times" about "having problem[s] with the Cape Coral steel as it was delivered to the site and inaccuracies in fabrication." (Tr. Vol. VI at 744). Norm Altman also acknowledged that by June 2006, the month Slater walked off of the job, "[t]he steel delay—both the drawing delay and the steel delivery to the site—were devastating to the project site." (*Id.* at 737). Similarly, Altman employee Jerry Mullins admitted that "[w]e were behind because we didn't have the steel[.]" (Tr. Vol. VIII at 1119).

{¶ 20} The record contains some opinion testimony that Slater likely would have fallen behind schedule, even if the steel had been delivered timely and in sequence, because his crew was too small and inexperienced for the job. (*See*, *e.g.*, Tr. Vol. VIII at 1022-1023, 1206, 1208-1209). As the trier of fact, however, the trial court had both the discretion and an evidentiary basis to find that "the delays in metal installation were due to the problems with timely and orderly delivery of materials from the steel supplier" and that "these supplier problems were not [Slater's] fault." (Doc. #120 at 1).

{¶ 21} There is also evidence in the record to support the trial court's finding that Slater did not agree to pay for an additional steel-erection crew. The existence or non-existence of such an agreement was a central issue below. Slater admitted participating in a May 2006 meeting with Altman representatives where hiring another crew was discussed. Slater recalled the following:

> Well, [Altman] was telling me that they were behind on their contract with
> Smoot and Smoot was raising a lot of problems for them about supposedly about
> the steel being late, being erected and they thought that they needed to bring in

another erector to help catch up with the, I guess, the lost time that was on the project. And they asked if they brought in another erector if that was a problem. And I said, well, what is it going to cost. And they said, we'll get back with you and give you a cost on it. And at the time they never got back with me and gave me no price. And matter of fact the next day this company [Watertown Steel] shows up.

(Tr. Vol. I at 65).

{¶ 22} Slater testified that upon arriving at the job site the day after the meeting he saw Watertown Steel workers present. He asked an Altman foreman what the workers were doing there. The foreman explained that Altman "had sent them out there." (*Id*. at 64). According to Slater, he responded that he was not paying them. (*Id*.). Slater also told the foreman, "It must be nice to have a bunch of money to be able to pay two contractors on the same project." (*Id*. at 66-67). Slater admitted, however, that he would have paid "a decent price" for Watertown Steel's help. (*Id*. at 112). But he insisted that Altman hired Watertown Steel without reaching an oral or written agreement with him. (*Id*. at 65; Tr. Vol. II at 153).

{¶ 23} Conversely, Norm Altman testified that Slater had agreed to pay Watertown Steel's workers $42.50 per hour to help with steel erection. (Tr. Vol. IV at 465-467). Norm Altman stated that Slater actually requested the help. (Tr. Vol. V at 669). He recalled orally telling Slater the price for Watertown Steel's help. (*Id*. at 170). He later sent Slater invoices that reflected the cost. (*Id*. at 170-171).

{¶ 24} Altman employee Jerry Mullins testified that he participated in the meeting where hiring help for Slater was discussed. Mullins recalled that Slater was "interested in knowing what their rates would be[.]" (Tr. Vol. VIII at 1210). According to Mullins, Slater also

insisted that any additional crew not be allowed to "come in and do all the easy stuff[.]" (*Id.*). Mullins testified that Slater was told the hourly rate for Watertown Steel's workers before they arrived on site and that Slater did not object to the rate or the extra help. (*Id.* at 1212).

{¶ 25}  Having reviewed the record, we find that there is evidentiary support for the trial court's determination "that [Altman] did not receive [Slater's] consent in the manner prescribed by their contract to reduce [Slater's] payment rights in order to pay for the additional steel installer, Watertown Steel, and that [Altman] made improper deductions from or reductions to [Slater's] payments." (Doc. #120 at 1). As the trier of fact, the trial court was entitled to credit Slater's testimony that he never orally agreed to pay Watertown Steel's workers. In this regard, we note the absence of a signed, written agreement by the parties requiring Slater to pay the bill for Watertown Steel's work. (Tr. Vol. III at 317; Tr. Vol. IX at 1276). Article 14.5 of the subcontract provides: "This Subcontract Agreement contains the entire agreement between the parties. Any executory agreement hereafter made shall be ineffective to change, modify, or discharge it in whole or in part, unless such executory agreement is in writing and signed by both the Contractor and Subcontractor." As set forth above, the subcontract between Slater and Altman provided for Slater to be paid $274,000 for steel-erection work. The absence of a signed agreement between the parties reducing this amount by the cost of Watertown Steel's work is also support for the trial court's judgment in favor of Slater.

{¶ 26}  We further note that the record fails to establish Altman's compliance with an alternate procedure set forth in Article 4.5 of the subcontract to supplement Slater's crew with additional workers. Article 4.5 provides:

> If the Subcontract(or) is responsible for any delays in the time and
> sequence of the schedule, the Subcontractor shall pay the Contractor for all costs

and damages suffered by the Contractor as a result of such delays. If at any time, the Subcontractor does not supply adequate supervision, skilled workmen, materials, and/or equipment to properly prosecute the Work; the Contractor upon 48 hours written notice, shall have the option to complete the Work of the Subcontractor. All costs incurred by the Contractor in completing the Subcontractor's Work * * * shall be deducted from any monies due or to become due the Subcontractor. The Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the Subcontractor Amount.

{¶ 27} Even if we were to accept Altman's argument that Slater was at fault for the project delays and that he failed to catch up as required by Article 4.6 of the subcontract,[4] Altman itself did not comply with Article 4.5 prior to supplementing Slater's crew with the Watertown Steel workers. The record contains no 48-hour written notice from Altman to Slater advising him that additional workers would be hired, at Slater's expense, to help Slater complete his steel erection.

{¶ 28} Absent either a written agreement between the parties pursuant to Article 14.5 or, alternatively, fault on the part of Slater and Altman's compliance with Article 4.5, we see no reversible error in the trial court's determination that Altman materially breached the subcontract by reducing Slater's pay to cover the cost of the Watertown Steel workers.[5] The trial court's

---

[4] Article 4.6 provides: "Any time the Subcontractor is behind schedule in the performance of the Work, or behind [in] the progress of the project, he shall, at his expense, perform any overtime work necessary to bring Work back on the current schedule."

[5] Parenthetically, we note that *after* Altman materially breached the contract by withholding Slater's pay, thereby prompting Slater to stop working at the site, Altman did send him written notice that it would be hiring new workers to complete all of his work and that it

resolution of that issue is supported by legally sufficient evidence and is not against the manifest weight of the evidence.

{¶ 29} In opposition to our conclusion, Altman contends correspondence from Slater to Jon Altman was adequate evidence to establish Slater's agreement to hire and to pay the Watertown Steel crew. We disagree. Altman's argument concerns a June 26, 2006 letter written by Mrs. Slater, purportedly with her husband's knowledge. (Tr. Vol. II at 213). This letter, which was written one month after Watertown Steel's arrival on site, bears Marshall Slater's typewritten name at the bottom and provides in relevant part:

SLATER WELDING & ERECTORS billed THE ALTMAN COMPANY for Mechanicsburg School K-12 for our thirty day billing cycle 4-24-2006 to 5-22-2006 for Labor and Equipment cost for the amount of $80,600 less retainage leaving the total amount due this billing cycle to be $71,644.00. Then on the 22nd of June when we received a fax from your office from accounting the total amount was only for $10,064.00. This amount will not cover employees cost not counting everything else that is needed for our work performance. We understand that WATERTOWN STEEL ERECTORS also need to be paid, but [their] billing is not until 5th billing cycle that which at this time SLATER WELDING & ERECTORS will adjusted [sic] the amount that is needed to pay for WATERTOWN'S work. We will be billing for the amount of 42,000.00 in the 5th billing cycle dated 5-22-2006 to 6-23-2006. * * *

---

would seek to hold him responsible for the cost. Altman did not provide such written notice, however, before hiring the Watertown Steel workers to assist Slater while he still was working.

(Defendant's Trial Exhibit I).

{¶ 30} The forgoing correspondence did not compel the trial court to find that Slater had agreed to hire and to pay for the Watertown Steel crew or that Altman properly had deducted the expense from Slater's pay. The letter does not contradict Slater's testimony that no oral agreement existed when Altman hired Watertown Steel. Nor does it establish compliance with Article 14.5 of the subcontract, which required any subsequent agreement between the parties to be in writing and signed. The letter reflects only an after-the-fact offer by Slater to pay at least some portion of Watertown Steel's bill if Altman would agree to delay the expense until the fifth billing cycle—an offer Altman refused. We are unpersuaded that the correspondence established Altman's entitlement to a judgment in its favor with regard to Slater's breach-of-contract claim.

{¶ 31} Based on the reasoning set forth above, the trial court's judgment is affirmed in part and reversed in part. The judgment is reversed insofar as the trial court failed to deduct from the $132,690 it awarded Slater the expense Altman incurred in having the disputed relief angle installed. The judgment is affirmed in all other respects. Unfortunately, we have been unable to locate where in the voluminous record Altman presented evidence as to the specific cost of having the relief angles installed. Therefore, the cause will be remanded to give Altman an opportunity to identify such evidence for the trial court. If Altman is able to point out evidence in the present record establishing the cost it incurred in having the relief angle installed, the trial court shall reduce Slater's judgment by that amount.

{¶ 32} Judgment affirmed in part, reversed in part, and cause remanded.

. . . . . . . . . . . . .

FROELICH and WELBAUM, JJ., concur.

Copies mailed to:

Aaron Falvo
Steven D. Rowe
Erica A. Probst
Hon. Nick A. Selvaggio